UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SAVINGS BANKS EMPLOYEES RETIREMENT ASSOCIATION, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 04-11545-EFH |
| EAST BOSTON SAVINGS BANK; BELMONT SAVINGS BANK; CAPE COD FIVE CENTS SAVINGS BANK; BRIDGEWATER SAVINGS BANK; SOUTH SHORE SAVINGS BANK; BERKSHIRE SAVINGS BANK; and WORONOCO SAVINGS BANK, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' PRE-TRIAL MEMORANDUM**

**I.   INTRODUCTION**

Plaintiff, Savings Banks Employees Retirement Association, ("SBERA"), improperly seeks to recover alleged post-termination fees from the Defendants, four Massachusetts savings banks which are members of this statutorily created entity, SBERA.[1]  SBERA's post-termination fees however, are unenforceable penalties because: (i) SBERA's post-termination costs from the withdrawal of a bank are not difficult to determine, and indeed its actual costs could have been calculated, and (ii) the fees bear no relationship to SBERA's actual or expected post-termination costs.

SBERA admits that it could have quantified its costs following a bank's departure. Indeed, SBERA admits that it could have billed the departing banks for SBERA's *actual costs*.

---

[1] East Boston Savings Bank, Cape Cod Five Cents Savings Bank, South Shore Savings Bank, and Berkshire Bank, (collectively, the "Banks") withdrew from SBERA at different dates in 2004 and 2005.

Instead, however, SBERA decided to impose a post-termination fee on the departing banks in the amount of two times each bank's previous annual assessment for operational costs. A bank's annual assessment however, has no bearing on SBERA's post-termination costs. Indeed, SBERA has failed to identify any data or analysis (because it cannot) purporting to demonstrate a relationship between the annual assessment and its post-termination costs. Instead of implementing a fee structure that was a reasonable approximation of its actual costs, or tracking its actual costs and billing the departing banks accordingly, SBERA estimated its post-termination costs by:

> "Just looking at it [the annual assessment] and saying one year wouldn't be enough. Three years would be too much. That's the data."
> *Deposition of Thomas Forese, Jr., President and Plan Administrator of SBERA, ("Forese Dep."),* page 68, lines 8-12.

Such an analysis is absurd, and entirely unreasonable. SBERA's post-termination fees are unenforceable penalties, and this Court should enter judgment for the Defendants.

## II.   BACKGROUND

SBERA is a statutorily created entity charged with administering retirement plans for Massachusetts savings banks. At the time the Defendant Banks joined SBERA, SBERA was the exclusive administrator for savings banks' employee retirement plans pursuant to M.G.L. c. 168 §39, which required any Massachusetts savings bank providing its employees with retirement plans to use SBERA.[2] Despite its monopoly, in the mid-to-late 1990's SBERA was faced with a

---

[2]   The original text of M.G.L. c. 168, §39 applicable at the time the Banks joined SBERA stated:

> [SBERA] shall be the exclusive provider of such plans to all savings banks established under the laws of the commonwealth. No such savings bank may establish or provide any such plans to its employees independent of the association; provided, however, that nothing contained herein shall be construed

(continued…)

declining membership due to the trend toward bank consolidation, and began to lobby the Massachusetts legislature for a change in the statute.[3]  In 2002, the legislature amended Section 39, and effective January 1, 2004, savings banks were free to withdraw from SBERA and transition their retirement plans to new providers.[4]

Prior to the change in the statute, as early as 1998, SBERA began laying the groundwork for a post-termination fee arrangement that would allow it to continue dominating the savings banks' retirement plan market, even after SBERA membership became voluntary.  SBERA's purpose in imposing a post-termination fee was two-fold: (i) to discourage member banks from withdrawing from SBERA, and (ii) to provide SBERA with a *windfall* from those banks willing to pay a penalty in order to leave SBERA.

On September 24, 1998, SBERA's Board of Trustees passed a by-law purporting to authorize a post-termination penalty on banks withdrawing from SBERA.  This by-law was proposed at a most auspicious time for SBERA, when membership in SBERA was mandatory, and the banks were unaware that SBERA's continued monopoly over their retirement plans would be short-lived.  Moreover, the by-law was proposed, and passed, at a time when SBERA's Board of Trustees was dominated by executives of a for-profit corporation, Northeast Retirement

---

> as requiring any such savings bank to provide such plans to its employees. *M.G.L. c. 168, 39.*

[3] It is unclear whether SBERA lobbied for a change in this law to make SBERA membership voluntary, as it claims, or merely expressed support of the change in the law once its passage became inevitable.  In any event, the only salient point is that SBERA admits that it had early knowledge of the impending change in the law which would effectively remove its monopoly power over the Defendants Banks' retirement plans.

[4] The amended text of M.G.L. c. 168, §39 states:

> Membership in the association is voluntary and any bank may establish or provide qualified retirement plans for its employees independent of the association; but, nothing contained herein shall be construed so as to require any bank to provide qualified retirement plans to its employees. *M.G.L. c. 168, §39*

Services ("NRS"), whose financial interests were in direct conflict with SBERA's fiduciary obligations.

SBERA's 30(b)(6) designees described a troubling, and indeed, improper relationship between NRS and SBERA. NRS is a for-profit corporation organized under the laws of Massachusetts. The common link between SBERA and its for-profit sister corporation, NRS, begins with Thomas Forese, Jr. During the Banks' membership in SBERA, Mr. Forese served simultaneously as SBERA's Plan Administrator and President of NRS. During Mr. Forese's dual tenure, 95% of NRS' gross revenues were generated by SBERA, and Mr. Forese collected his entire salary from NRS. Indeed, all of NRS' employees - who were performing the very functions that SBERA was required by statute to provide to the savings banks – received their salaries directly from NRS. Significantly, throughout this time, *SBERA did not even have a single employee on its payroll.*

SBERA's 30(b)(6) designees (Mr. Forese and Christopher Hulse), describe the relationship between SBERA and NRS as one of "total overlap" and "total congruence."[5] Not surprisingly, this "total overlap" extended to SBERA's Board of Trustees as well, where a majority of its voting Trustees were also employees and/or affiliates of NRS. Indeed, the SBERA Board that purportedly authorized the post-termination fees was dominated by NRS employees and affiliates. The Defendant Banks had expressed concerns regarding the conflict of

---

[5]    Q. …How many employees did NRS have back in the 1999, 2000 framework?
         A. Twelve, 13.
         Q. How many employees did SBERA have?
         A. None. They had the same officers as NRS.
         Q. So there was total overlap?
         A. Yes.
    *Forese Dep.*, page 27, lines 11-17

interest between NRS and SBERA for years, and when SBERA membership became voluntary in 2004, the Banks began to make arrangements to transition their plans to new providers.

SBERA was soon faced with an unprecedented loss of members. In an effort to stem the tide of withdrawals, and leverage hundreds of thousands of dollars in post-termination penalties from the departing Banks, SBERA refused to transfer any participant data until the Banks paid the post-termination penalties. Only after the Banks' counsel explained to SBERA that such actions constituted clear and flagrant violations of ERISA, did SBERA relent and transfer the participants' data. Having been unsuccessful in its hold-back attempt, SBERA now seeks to recover these post-termination fees through this litigation.

### III.  ARGUMENT

#### A.  SBERA Acted In Bad Faith And In A Self-Interested Way, In Violation of Its Fiduciary Obligations

*The Doctrine of Corporate Disregard Applies*

Where there is total dominance of an entity, such as NRS' dominance of SBERA, all in its self-interest, the doctrine of corporate disregard may apply. This action is freighted with unlawful self-interest on the part of SBERA and NRS. Courts apply the corporate disregard doctrine and ignore corporate formalities where, as here, such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice. *See My Bread Baking Co., v. Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968). This Court would be well within its prerogative to ignore the corporate formalities here, and determine that SBERA is so dominated by NRS that the purposes of the legislation creating SBERA have been subverted.[6] *See A.G. v. MCK Inc.,*

---

[6] It should be noted that NRS has not sought to join this action as a party, presumably relying on SBERA to protect its financial interests.

432 Mass. 546, 555 (2000), and *Packard Clothes, Inc. v. Director of the Div. of Employment Sec.,* 318 Mass 329, 335 (1945).

### *SBERA Seeks To Enforce A "Contract" That It Admits Does Not Exist*

As an initial matter, there is seemingly no contract at issue in this case. In the joint pre-trial statement, SBERA states that the Banks "failed to satisfy an obligation to SBERA to pay termination fees." Conspicuously, there is no reference to a contract. Instead, SBERA apparently seeks to recover payment of post-termination fees from its former member Banks on the basis of a by-law. While in certain situations, the by-laws of a corporation are recognized as a contract between the corporation and its members, *Jessie v. Boynton*, 372 Mass. 293 (1977), this is not such a case. Indeed, SBERA's 30(b)(6) designee (Mr. Forese) disputes that the termination fee by-law is a contractual obligation. Mr. Forese states in no uncertain terms that the termination fee by-law is not a contract.

> Q. …You have a vote of the trustees that deals with termination fees, correct?
> A. …Yes.
> Q. …You consider that to be a binding contract because in effect you've sued on it to try to collect those termination fees?
> A. Not a contract…It's not a contract. You're a member of an association. When you're a member of an association, you live by the rules of the association. So there's no contract here.

### *SBERA Breached Its Common Law Duty of Good Faith And Fair Dealing*

Moreover, to the extent there is a contract between SBERA and the Banks, there is also an implied covenant of good faith and fair dealing between the parties. *Warner Ins. Co. v. Commissioner of Ins*. 406 Mass. 354, 362 (1990). The implied covenant of good faith and fair dealing provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to recover the fruits of the contract…" *Anthony's Pier Four,*

*Inc. v. H.B.C. Associates,* 411 Mass. 451, 471-472 (1992), *quoting Drucker v. Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976).

Moreover, it is well established that in this situation, "the directors of a corporation have a *fiduciary duty* of fair dealing with its members or shareholders in situations where corporate action is being proposed which may affect one or more shareholders adversely." *Jessie v. Boynton,* 372 Mass. 293, 303-304. And courts routinely recognize "an even higher standard than fair dealing in the case of a close corporation." *See Wilkes v. Springside Nursing Home, Inc. 370 Mass. 842, 848-851.*

SBERA's relationship with the Banks is analogous to that of shareholders in a close corporation. As set forth by the Supreme Judicial Court of Massachusetts in *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 585-586 (1975), the defining characteristics of a close corporation are the following: a small number of stockholders, no ready market for its corporate stock, and substantial majority stockholder participation in the management, direction, and operations of the corporation.

As such, SBERA owed the Banks a heightened duty of good faith and fair dealing. Courts recognize that the fiduciary obligations owed by principal shareholders in a close corporation to each other and minority stockholders is akin to the "*more rigorous duty* of partners and participants in a joint adventure…" *Id.* at pages 594 (emphasis added). *Rodd* explicitly extended this heightened fiduciary obligation between partners and participants in a joint adventure, to stockholders in a close corporation.

As described by then Chief Judge Cardozo of the New York Court of Appeals, in *Meinhard v. Salmon*, 249 N. Y. 458 (1928),

> "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of

> conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary duties. . . . Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."
> *Id*. at 463-464.

SBERA has failed to discharge its responsibilities to the Banks in conformity with this strict good faith standard. SBERA engaged in self-dealing that promoted NRS' financial interests to the detriment of the Banks and participants.[7] As a fiduciary, SBERA was charged with heightened disclosure obligations. Indeed, it is well established that where a trustee fails to disclose material facts to a beneficiary, that trustee has breached his fiduciary duty of disclosure even if he has acted in good faith. *Akin v. Warner*, 318 Mass. 669, 675 (1945).

Courts recognize that failure to disclose when there is a duty to disclose is equivalent to an affirmative misrepresentation. *Puritan Medical Center, Inc. v. Cashman*, 413 Mass. 167, 176 (1992); Restatement (Second) of Torts 551 (1977). "[A] fiduciary's silence is equivalent to a stranger's lie." *Energy Resources Corp., Inc. v. Porter*, 14 Mass. App. Ct. 296, 304 (1982) (Brown, J., concurring). In the words of Justice Cardozo:

> "if dual interests are to be served, the disclosure to be effective must lay bare the truth without ambiguity or reservation, in all its stark significance."
> *Wendt v. Fischer*, 243 N.Y. 439, 443 (1926).

SBERA acted in bad faith and in violation of its fiduciary obligations in failing to disclose material information to the Banks. More specifically, SBERA failed to disclose to the Banks the inherent conflict of interest in allowing its NRS-dominated officers and Board to

---

[7] NRS is the organization, as between it and SBERA, with revenue and costs (including payroll). Any revenue necessarily passes through SBERA to NRS to allow NRS to pay for its employees, and SBERA's officers and trustees. As such, NRS is arguably the only organization that could have been damaged by a bank departing without paying the fee, and is the only organization that stood to benefit financially from the post-termination fees. NRS is not a party to this action.

impose a fee that would ultimately inure to NRS. Indeed, SBERA's Board purported to bind the Banks to an agreement to pay a post-termination fee that would have a profound and adverse effect on the Banks' opportunities to transition their employees' retirement plans to other providers, without disclosing to the Banks material information regarding these fees.

SBERA also failed to disclose to the Banks – as it was required to by law – not only the adverse effects these fees would have on the Banks, but on the Banks' employees as well. SBERA's failure to disclose details of these self-interested transactions constitute a violation of its fiduciary obligations. *Boston Children's Heart Foundation, Inc. v. Nadal-Ginard,* 73 F.3d 429, 434 (good faith requires a corporate officer to disclose fully and honestly any material information relevant to a self-interested transaction so that a disinterested decision maker may exercise informed judgment); *Durfee v. Durfee & Canning, Inc,.* 323 Mass. 187, 203 ("no half-hearted disclosure or partial discovery" would satisfy the corporate fiduciary's obligation to make full disclosure; rather, the corporation "must be apprised of all the material facts and as well of their legal effect."); *Cooke v. Lynn Sand & Stone Co.,* 37 Mass. App. Ct. 490, 497 (1994)(a corporate fiduciary seeking to profit from a contract with the corporation is required to make full contemporaneous disclosure of all contract's terms to the director-shareholders).

### *SBERA Violated Its Fiduciary Obligations Under ERISA*

SBERA's actions also fail to comport, in material respects, with its obligations under ERISA.[8]  SBERA's by-laws explicitly provide that SBERA should conduct its affairs so as to comply at all times with ERISA, and that the Plan Administrator "shall administer the Plan in

---

[8] This case is suffused with fiduciary obligations, including those arising under ERISA. The Banks removed this action to this Court in 2004, on the basis of this Court's jurisdiction over ERISA matters. SBERA did not oppose the Banks' removal petition. Indeed, in a prior case brought by SBERA regarding the same termination fees at issue here, Chief Judge Young of this Court rejected SBERA's opposition to the banks' removal petition, finding federal jurisdiction. *SBERA v. United States Trust Corp.*¸ Civil Action No. 99-12282 (WGY).

accordance with the requirements of these by-laws and…ERISA…" Further, the enabling legislation for SBERA explicitly provides that ERISA governs SBERA's plan administration. *See M.G.L. c. 168, §39*.

As the Plan Trustee, SBERA owed fiduciary obligations under ERISA. ERISA provides that "a person is a fiduciary with respect to a plan to the extent ... he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(iii). Fiduciary obligations under ERISA are "the highest known to law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272, n.8 (2d. Cir. 1982).

Section 404(a)(1) of ERISA, which imposes an overall requirement upon ERISA fiduciaries to discharge all of their duties "solely in the interest of the participants and beneficiaries," establishes the foundational obligation of loyalty for all ERISA fiduciaries. *See Gilliam v. Edwards*, 492 F. Supp. 1255, 1261 (D.N.J.) (1980). This duty of loyalty is broad, based on both the specific statutory charge and the common law of trusts. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110-11 (1989); *Eddy v. Colonial Life Ins. Co.*, 287 U.S. App. D.C. 76 (D.C.Cir. 1990). Moreover, this Court has the power under ERISA to fashion the common law based on the law of trusts, to construe ambiguous statutory language and fill gaps in the statute. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-15 (1989).

The description by SBERA's 30(b)(6) designees of the "total overlap" and "total congruence" between SBERA and NRS is astounding, and undercuts SBERA's claims that the post-termination fees were intended to recover its post-termination costs. The deposition testimony of SBERA's witnesses makes it clear that NRS used SBERA to take advantage of a captive and lucrative audience: a consortium of savings banks, that were mandated by state law to leave their retirement plans with SBERA. Faced with an impending loss of its profitable

monopoly, SBERA and NRS implemented a post-termination fee designed to prevent banks from withdrawing and to collect a *windfall* from those that opted to depart.  SBERA's attempt to profit from its self-dealing is unlawful and contrary to ERISA.

> "…The fiduciary provisions of ERISA were designed to prevent a [fiduciary] 'from being put into a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *NLRB v. Amax Coal Co., Div. of Amax, Inc.*, 453 U.S. 322, 334 (1981) (*quoting H.R.CONF.REP.NO.* 93-1280, at 309 (1974), reprinted in 1974 U.S.C.C.A.N. 5089). *See also, Gilliam v. Edwards*, 492 F. Supp. 1255 (D.N.J.) (1980) (holding the fiduciary defendant in violation of ERISA for having himself hired as fund administrator when he also served as the trustee of the fund and business manager of union to which fund participants belonged).

SBERA's business dealings with the Banks were intended to benefit its for-profit sister corporation, NRS, to the Banks' detriment.  Because the contracts between them are, by definition, self-interested, SBERA has the burden of proving their fairness.  *See Geller v. Allied-Lyons PLC,* 42 Mass. App. Ct. 120, 125 n.8, 674 N.E.2d 1334 (1997) ("When a self-interested contract is challenged, the burden is on the fiduciary to prove its fairness").

    **B.**    <u>**SBERA's Post-Termination Fees Are Unenforceable Penalties**</u>

While SBERA claims - because the controlling caselaw requires it to - that its post-termination fees are enforceable because they were intended to reasonably approximate its post-termination costs, this claim simply cannot be reconciled with the facts of this case.  Termination fee provisions are analogous to liquidated damages provisions.  *See Cottle v. Storer Communication, Inc.,* 849 F. 2d 570 at 578 (11th Cir. 1988); *Enpath Medical Inc., v. NeuroControl Corporation,* 2005 U.S. Dist. LEXIS 7646 at *12, 04-3813, (D. Minn. 2005).

As set forth by Judge van Gestel of the Massachusetts Superior Court, in *The Trustees of Boston College v. The Big East Conference*, a highly visible case involving Boston College's

departure from the Big East Conference, for a withdrawal fee to be acceptable as liquidated damages:

> …the amount should provide no more than the protection needed, must approximate the actual loss suffered, and cannot be insufficiently related to the harm involved. If the exit payment is otherwise, it would constitute an unreasonable penalty which would be void and legally unenforceable. *See, e.g., Wilson v. Clarke,* 470 F. 2d 1218, 1222 (1st. Cir. 1972); *Perfect Solutions, Inc. v. Jereod, Inc.*, 974 F. Supp. 77, 82-83 (D. Mass. 1997); *Security Safety Corp. v. Kuzniki*, 350 Mass. 157, 158 (1966); *A-Z Servicecenter, Inc. v. Segall,* 334 Mass. 672, 675 (1956).
> *The Trustees of Boston College v. The Big East Conference,* No. 03-4818 BLS, 2004 Mass. Super. LEXIS 298 at *4 (Sup. Ct. 2004)

Section 356(1) of the Restatement (Second) of Contracts endorses a similar liquidated damages analysis:

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing *unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty*. (emphasis added).

SBERA's post-termination fees fail under this analysis. As set forth more fully below, SBERA's actual post-termination costs were easily determinable, and its assessed fees bear no relationship to its anticipated costs.

### ***SBERA's Anticipated Costs Were Not Difficult to Ascertain***

Testimony by SBERA's representatives clearly contradict any claim by SBERA that its post-termination costs were difficult to determine.[9] SBERA admits that it affirmatively chose *not to track its post-termination costs* - not because it would be difficult to do so - but because in

---

[9] The following facts are largely taken from the deposition testimony of SBERA's 30(b)(6) designees, Thomas Forese and Christopher Hulse (Senior Vice President of SBERA).

his view, it would be "meaningless," because what happens for one bank is not necessarily what would happen for another.

If SBERA were truly trying to impose an equitable post-termination fee approximating its actual out of pocket expenses, it seems the most reasonable, and indeed accurate approach, would have been for SBERA to track its costs for each bank, and bill each bank accordingly. According to Mr. Forese however, such an approach was undesirable because billing for SBERA's actual costs would make it a "different organization" and "we wouldn't be the organization we are." *Forese Dep.*, page 42, lines 6-13.

> Q. "Why again couldn't you calculate what the fees were by certain categories and then bill the former member?"
> A. "That's not the type of organization we are."
> Q. What do you mean by that again?
> A. Our people do not bill time. Our people provide a service and that service is based on overall assessments, not the individual time that is spent.
>
> *Id.,* page 81, lines 4-12

Indeed, Mr. Forese did not even discuss with the SBERA board the notion that, as termination costs accumulated, SBERA could bill such costs. Nor did Mr. Forese confer with legal counsel about changing the contractual array between SBERA and the member banks so that SBERA could bill and collect for post-termination activities. According to Mr. Forese, SBERA did not want to send a bill to the departing Banks for the post-termination fees because there were concerns that they would refuse to pay. The Banks are banks, and creditworthy. It seems disingenuous for SBERA to cite the risk of collection in this context. Presumably, it was this concern that led to SBERA's ill-conceived decision to withhold participants' data in an attempt to ensure payment of the post-termination penalty from the Banks. Notwithstanding

SBERA's philosophical opposition to tracking costs and billing the Banks accordingly, the fact remains that SBERA itself has conceded its costs were not difficult to ascertain.

### *SBERA's Post-Termination Fees Are Not A Reasonable Estimate of Its Expected Costs*

SBERA's claim that there is a "reasonable" relationship between the Banks' annual assessments and its post-termination costs is entirely without merit. The Banks' annual assessment fee is based on the number of participants. SBERA has failed to identify any factual support for its claim that there is a relationship between the annual assessment and the post-termination fees. To the contrary, Mr. Forese imposed a fee in the amount of two times the bank's previous year's assessment based on the following "analysis":

> "Just looking at it and saying one year wouldn't be enough. Three years would be too much. That's the extent of the analysis based on data." *Id.,* Page 68, lines 10-12.

Such a lackadaisical and arbitrary determination simply cannot withstand scrutiny under the penalty analysis.

### IV.     Conclusion

For the reasons set forth above, SBERA's post-termination fees are unenforceable penalties as a matter of law, and judgment should enter for the Defendant Banks.

- 15 -

Respectfully Submitted,
EAST BOSTON SAVINGS BANK,
CAPE COD FIVE CENTS SAVINGS
BANK, SOUTH SHORE SAVINGS
BANK, and BERKSHIRE BANK,

by their attorneys,

/s/ Nicole A. Colby Longton
_____
James J. Marcellino, Esq., BBO # 318840
Nicole A. Colby Longton, Esq.,
BBO # 657478
MCDERMOTT WILL & EMERY, LLP
28 State Street
Boston, MA  02109-1775
(617) 535-4045

BST99 1496920-4.069465.0011