UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVINGS BANKS EMPLOYEES RETIREMENT ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>EAST BOSTON SAVINGS BANK; BERKSHIRE BANK; CAPE COD FIVE CENTS SAVINGS BANK; SOUTH SHORE SAVINGS BANK; and WORONOCO SAVINGS BANK,<br><br>Defendants. | CIVIL ACTION NO. 04-11545-EFH |

## TRIAL BRIEF OF SAVINGS BANKS EMPLOYEES RETIREMENT ASSOCIATION

Savings Banks Employees Retirement Association ("SBERA") hereby submits its trial brief pursuant to the December 14, 2005 Order of this Court.

This is a straightforward case. SBERA is a state-mandated, unified pension program for Massachusetts Savings Banks. Pursuant to its by-laws, SBERA's Board of Trustees voted to assess banks that withdraw from SBERA a termination fee. Defendants East Boston Savings Bank, Berkshire Bank, Cape Cod Five Cents Savings Bank, South Shore Savings Bank, and Woronoco Savings Bank (collectively "Defendant Banks") were members that withdrew their plans from SBERA. SBERA assessed Defendant Banks the termination fee and they have refused to pay. Defendant Banks owe SBERA the termination fees.

The evidence presented at trial will show that when banks withdraw their retirement plans from SBERA, they impose costs on the organization. During the 1990s, a number of banks withdrew their plans from SBERA because they merged with or were acquired by non-SBERA banks. At that time, there was no other way in which a bank could leave SBERA because

B3179397.1

Massachusetts law did not permit voluntary withdrawal from the organization. See Mass. Gen. L. ch. 168 § 39 (amended 2002). As those banks withdrew, SBERA faced post-termination costs that would be absorbed by the existing members. As a result, SBERA's Board of Trustees decided to charge the post-termination costs to the departing banks in the form of a termination fee.

SBERA had the right to assess its departing members termination fees. SBERA is a statutorily-created entity governed by M.G.L. ch. 168 § 39. Its Board of Trustees is made up of representatives of member banks. SBERA's by-laws grant the Trustees with the authority to "make such rules and regulations for such administration as they deem necessary" and for "[a]dditional assessments [to] be authorized by the Trustees at any regular or special meeting." See By-Laws of the Savings Banks Employees Retirement Association, §§ 2.3, 2.6.

The evidence will show that SBERA's Board of Trustees acted in accordance with its by-laws when it voted to assess a termination fee against any bank that withdrew its plan from SBERA. At a regular meeting of the Board of Trustees held on September 24, 1998, and again at a meeting held on November 17, 1998, the Trustees discussed the implementation and amount of a termination fee. See Minutes of SBERA Board of Trustees Meeting, September 24, 1998; Minutes of SBERA Board of Trustees Meeting, November 17, 1998. SBERA President and Plan Administrator, Thomas Forese ("Forese"), proposed to the Board that the fee be equivalent to two years annual assessment. The Trustees were aware that their own banks could merge or be acquired and thus subject to such a termination fee. Nonetheless, at both the September and November, 1998 meetings, the Trustees voted overwhelmingly in favor of establishing a termination fee equal to twice a bank's annual assessment. See Minutes of SBERA Board of

Trustees Meeting, September 24, 1998; Minutes of SBERA Board of Trustees Meeting, November 17, 1998.

The votes taken by SBERA's Board of Trustees created an enforceable agreement with the member banks. Unincorporated associations are governed by their by-laws, which have binding contractual effect on the association members. See e.g. Kelly v. Weiss, 102 N.E.2d 93, 94 (Mass. 1951). Therefore, after 1998, all banks withdrawing from SBERA were obligated to pay a termination fee that was equal to two years annual assessment.

The evidence presented at trial will show that the Defendant Banks refused to pay the termination fee in breach of their legal obligation to SBERA. Effective January 1, 2004, Mass. Gen. L. ch. 169 § 39 was amended to make membership in SBERA voluntary. At various times during 2004, Defendant Banks withdrew their retirement plans from SBERA. Accordingly, SBERA assessed Defendant Banks termination fees equal to twice their annual fees. Defendant Banks, without justification, have refused to pay the termination fees.

The Defendant Banks reaped the benefit of the termination fees paid by prior departing banks. Prior to 2004, seventeen banks had withdrawn their retirement plans from SBERA and had paid the termination fees assessed them.[1] Had earlier departing banks not paid their termination fees, the costs associated with those departed plans would have had to have been absorbed by the then-current members of SBERA, including Defendant Banks. Because other departing banks paid their termination fees, SBERA did not need to incorporate the costs of the departed plans into the annual fees paid by current members.

The Defendant Banks' refusal to pay the termination fees is indefensible. They have not alleged that the Board of Trustees lacked the power to impose a termination fee. They have not

---

[1] Since 1998, a total of 27 banks have withdrawn from SBERA and paid the assessed termination fees.

alleged that the vote was invalid or took place outside of a proper Board meeting. There has been no suggestion of coercion or duress. SBERA's Trustees were high level representatives of its member banks -- sophisticated business people who could represent the interests of their individual banks. Indeed, the President of Defendant East Boston Saving Bank was a Trustee at the time of the passage of the termination fee and participated in the discussion and vote. The Defendant Banks have admitted that they were aware of the fee and have admitted that they refused to pay it.

In the face of SBERA's apparent right to collect the termination fees,[2] the Defendant Banks struggle to claim that the fees were unreasonably high, that they constituted a "penalty," and that the fees were imposed in order to deter banks from leaving SBERA. There is neither factual nor legal merit to these responses.

Although unnecessary, the evidence that SBERA will present at trial will demonstrate that the fee structure passed by SBERA's Board of trustees was reasonable. Unlike other retirement fund administrators, such as Fidelity or Mass Mutual, SBERA is both a plan administrator and plan trustee, offering its members a unique all-in-one service. Because of SBERA's unique role as plan trustee, it has fiduciary obligations to plan participants that remain even after a plan has been withdrawn from SBERA. These obligations cause SBERA to incur costs when a bank withdraws its plan. These costs can include: preparation of data formats and de-conversion files for new provider, storage and retrieval of records, liquidation and transfer of plan funds, preparation of form 5500 for last year of SBERA membership, preparation of Form 1099-R for participant distributions in last year of SBERA membership, participant inquiries

---

[2] The Defendant Banks have also claimed that the termination fees violate ERISA because in passing them, SBERA somehow violated a fiduciary duty to the member banks, i.e. the plan sponsors. There is simply no case support for the proposition that there is an ERISA-regulated fiduciary duty from SBERA to the defendants. And if there were, there is no basis for any claim that it has been violated.

B3179397.1                                              - 4 -

following plan departure, Internal Revenue Service and Department of Labor audits for departed plan, regulatory reviews or actions requiring historical inquiry, and legal and advisory expenses.

In 1998, after having lost a number of plans to mergers, the Board of Trustees saw a need to be fair both to the departing banks and to those banks remaining with SBERA by passing the costs associated with plan termination on to the departing banks. Forese and SBERA's actuary, Peter Timmons, engaged in discussions regarding what costs SBERA incurred upon the withdrawal of a bank and what level of fee would cover those costs. They took into consideration various factors. SBERA is a small organization. It provides a unique service to the banks it services. It has always handled costs in a broad brush manner, assessing a per capita annual fee for all members despite the fact that in any given year some banks will consume a great deal of SBERA's services and others will require very little. Although, it would have been an option for SBERA to purchase and implement a time/cost tracking system, this would have been an additional cost out of proportion to the issue and would not have accounted for overhead costs. In any event, it did not seem advantageous to attempt to bill former participants for their withdrawal costs because these banks were usually merged into other entities, thus rendering collection impracticable. In the first year following a bank's departure, the administrative costs remain high, approaching the costs SBERA incurs for current members. In the following years, while reduced, there continue to be costs to SBERA related to data retention, inquiries and audits. Therefore, SBERA's management made an estimate of the cost to SBERA of a bank's departure and determined that one year's service fee would tend to be too low to cover that cost, but that three years service fee would tend to be too high. Accordingly, Forese recommended to the Board of Trustees that the fee to be imposed upon termination be equal to two years annual service fee. After considering Forese's recommendation, and the comments of one or two

Trustees who opposed the fee, the Board saw no reason to depart from SBERA's usual practical method of charging fees for its services and voted overwhelmingly in favor of the fee at the twice annual fee level. Indeed, in 2003, when banks started to withdraw from SBERA voluntarily and in order to acquaint new Board members with the termination fee structure, the Chairman of the Board of Trustees, David Bruce, requested that SBERA Vice President, Chris Hulse ("Hulse"), undertake more detailed calculations of the costs associated with a bank's withdrawal. Husle's calculations demonstrated that the twice annual fee was consistent with the estimated costs of a bank's withdrawal.

The termination fee is not a penalty. Defendant Banks support that the termination fees are akin to a liquidated damages clause for a breach of contract. This argument is wrong. The fees are not assessed as a result of any breach or because Defendant Banks are terminating their relationship at an earlier than agreed time. Since the amendment to the legislation governing SBERA, the Defendant Banks are permitted to withdraw their plans from SBERA at any time. The Board of Trustees only requires that banks pay for the costs of their departure whenever they choose to leave. The only breach here is the Defendants Banks' failure to pay.

The termination fee is merely a charge for what are undisputed costs associated with a bank's withdrawal of its retirement plan. There is no rule of law that says that one party and another cannot agree to a fee for services.[3] There is also no rule of law that requires the fee to be precisely the amount of the costs incurred. For instance, lawyers are permitted to charge clients

---

[3] SBERA contends that the termiantion fee is not a "liquidated damage." However, even if were, this Court has already said that the common law doctrine on liquidated damages has no place in ERISA disputes. See Fanning v. S.M. Lorusso & Sons, Inc., 2004 U.S. Dist. LEXIS 881, *14 fn2 (D. Mass. 2004) (citing Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp., 258 F.3d 645, 655 (7th Cir. 2001)("And while the ban on contractual penalties remains an established principle of the law of contracts, it is antiquated and should not be extended into ERISA-land . . . . It is easy to assign nonexploitive reasons for contractual penalties and hard to give convincing reasons why in the absence of fraud or unconscionability consenting adults that are moreover, substantial organizations rather than mere consumers should be prohibited from agreeing to such provisions")).

retainers. If a lawyer takes a $10,000 retainer, but the client's matter only requires $1,000 worth of hourly time charges, the law does not label the remaining $9,000 a penalty. Similarly, if an investment manager charges a client a fee based on a percentage of the client's investment portfolio, that fee does not transform into a penalty if the investments lose money. SBERA has always charged its members a per capita fee regardless of how much or how little of SBERA's services a particular bank requires in a given year. In setting the termination fee at twice a bank's annual assessment, SBERA was addressing in a similarly practical manner the fact that the costs associated with the withdrawal of some banks would be less than the two years' fee, but others would cost more.

The evidence will also show that the termination fees could not have been instituted with the purpose of preventing banks from leaving. In 1998, when the fees were passed, membership in SBERA was mandatory. No voluntary departure was permitted. Only if a bank merged with or was acquired by a non-SBERA bank could it withdraw its plan from SBERA. The issue of making membership in SBERA voluntary was not even raised until some two years later when a Trustee brought it up to the Board. Based upon this suggestion and a later Board vote, sometime in 2002, Forese submitted proposed legislation to the Massachusetts legislature to make SBERA membership voluntary. This amendment was adopted and became effective January 1, 2004, some five and a half years after the Board adopted termination fees.

## CONCLUSION

At trial, the evidence will show that SBERA assessed the Defendant Banks termination fees that they refused to pay, in breach of their obligation. Accordingly, SBERA requests that the Court enter judgment in its favor and order the Defendant Banks to pay SBERA the termination fees owed, plus interest and costs.

Respectfully submitted,

SAVINGS BANK EMPLOYEES
RETIREMENT ASSOCIATION,

by its attorneys,

  s/Alicia Alonso Matos
Arthur G. Telegen, BBO # 494140
Alicia Alonso Matos, BBO # 651154
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

Dated: April 3, 2006