# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * *

SAVINGS BANK EMPLOYEES
RETIREMENT ASSOCIATION,
                Plaintiff

          v.                                   CIVIL ACTION NO.:
                                                      04-11545-EFH

EAST BOSTON SAVINGS BANK, ET AL.,
                Defendants.

* * * * * * * * * * * * * * * * * * * * * * * *

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

May 9, 2006

HARRINGTON, S.D.J.

      This is a single count breach of contract action brought by Plaintiff Savings Banks Employees Retirement Association ("SBERA" or "the Association") against Defendants East Boston Savings Bank, Berkshire Bank, Cape Cod Five Cents Savings Bank, South Shore Savings Bank, and Woronoco Savings Bank (collectively "Defendant Banks" or "Banks").  This Court heard the parties' arguments during a two-day bench trial on April 3-4, 2006.  SBERA is a state-mandated, unified pension program that operates on behalf of Massachusetts savings banks.  The Defendant Banks are former members of SBERA who withdrew from the Association at different dates in 2004 and 2005.  The gravamen of plaintiff's case is that the Defendant Banks are in breach of contract for failing to pay a termination fee imposed on all member banks who withdraw

from SBERA. After considering all the evidence in the record and arguments of counsel, the Court concludes that the Defendant Banks are in breach of contract. The Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

Plaintiff SBERA is an entity that was created by the Massachusetts General Court for the purposes of administering, on behalf of Massachusetts savings banks, employee retirement plans qualified under Section 401 of the Federal Internal Revenue Code. See Mass. Gen. Laws ch. 168, § 39 *et seq*. SBERA is unique from other retirement fund administrators in that it serves as both a plan administrator *and* plan trustee. One of the consequences of this dual-role is that SBERA maintains fiduciary obligations to plan participants even *after* a plan has been withdrawn from the Association. Thus, when a bank withdraws its plan, SBERA's fiduciary obligations require it to perform certain tasks and incur certain costs, including: preparation of data formats and de-conversion files for a new provider; storage and retrieval of records; liquidation and transfer of plan funds; preparation of Internal Revenue Service ("IRS") Form 5500 for last year of SBERA membership; preparation of IRS Form 1099-R for participant distributions in the last year of SBERA membership; fielding participant inquires following plan departure; cooperating with IRS and Department of Labor audits for departed plans; and legal and advisory expenses. In an effort to mitigate these withdrawal costs, the SBERA Board of Trustees discussed, voted on, and passed a 1998 resolution imposing a termination fee on member banks who withdraw from the Association.[1]

---

[1] The SBERA Board of Trustees discussed and passed the termination fee resolution at two separate meetings. The first meeting took place on or about September 24, 1998, the second on or about November 17, 1998. (See Tr. Exhibits 2, 3) (meeting minutes). In 2003, the Board reexamined the termination fee to determine if it was a fair approximation of the costs generated by member bank withdrawal. The Board concluded that a two-year annual assessment was indeed fair and made no amendments to the resolution. (See Tr. Exhibit 4) (internal review of termination fee presented to SBERA Board of Trustees on May 6, 2003).

The termination fee imposed equals two-years annual assessment based on the departing bank's most recent annual assessment paid. Thomas Forese ("Forese"), SBERA's President and Plan Administrator, and Peter Timmons ("Timmons"), SBERA's Actuary, are the two persons who originally determined that a two-year assessment would be reasonable. They discussed the various costs occasioned by member withdrawal, and found that those incurred in the first year following a bank's departure remain high -- close, in fact, to those incurred for current members. These costs diminish in subsequent years, though not completely, because SBERA continues to be responsible for tasks such as data retention, participant inquiries, and government audits. Based on this information, Forese and Timmons concluded that a one-year service fee would not cover SBERA's costs, and that a three-year fee would tend to overcompensate the Association. Accordingly, Forese recommended to the Board of Trustees that the withdrawal fee imposed be equal to two times a bank's last annual service fee paid. The two-year fee was approved by an overwhelming margin of Trustees, and all member banks were made aware of the Board's action.

At the time the termination fee went into effect, membership in SBERA was statutorily required for Massachusetts savings banks under Mass. Gen. Laws ch. 168, § 39. The only way a bank could withdraw from SBERA was in the event of a merger with, or acquisition by, a non-SBERA bank. That law changed on January 1, 2004, at which time SBERA membership became voluntary. The Defendant Banks all withdrew from SBERA on dates after January 1, 2004. None, however, have paid the two-year assessment. The Banks' refusal to pay forms the heart of this action, and the payments required to bring the defendants into compliance are as follows: East Boston Savings Bank ($37,322.00); Berkshire Bank ($55,977.44); Cape Cod Five Cents

Savings Bank ($52,622.08); South Shore Savings Bank ($35,840.56); and Woronoco Savings Bank ($33,180.64).

SBERA's by-laws provide that its Trustees may "make such rules and regulations for [] administration as they deem necessary." (Tr. Ex. 1). The Trustees may also implement "additional assessments," provided such assessments are voted on and adopted at "any regular or special meeting." (Id.). Consistent with these provisions, the SBERA Board decided in 1998 to adopt a resolution imposing the termination fee at issue in this case. The fee was discussed at two separate meetings, and voted into effect by an overwhelming majority of the Board. The rationale underlying the termination fee was simple: (1) SBERA is required by law to perform services for departing banks, even *after* their departure; (2) these services cost time and money; and (3) the departing banks, not remaining members, should foot their own bill. The Defendant Banks have advanced two main theories as to why SBERA's termination fee is unenforceable. The defendants' first argument, put simply, is that the termination fee violates various fiduciary duties owed by SBERA to its member banks. Their second argument is that the fee constitutes an unenforceable "penalty." Neither theory operates on the facts of this case.

As to the first argument, even assuming as the Defendant Banks contend that SBERA held fiduciary duties of the highest level known under the law, neither the fee itself, nor the process by which SBERA put it into effect, ran afoul of these duties. The termination fee was passed not to secure a windfall to the Association or to discourage member banks from departing,[2] but rather to

---

[2] To reiterate, at the time the termination fee went into effect, and for several years thereafter, participation in SBERA was required by statute for all Massachusetts savings banks. Thus, the fee could not have been passed to discourage member banks from withdrawing, because Association membership was already mandatory.

protect SBERA's remaining members from having to foot the bill for services that, by law, the Association must provide to withdrawing banks. The fee was debated by SBERA's Board of Trustees in an open and transparent fashion, and it passed with overwhelming support. Nor does the termination fee constitute a "penalty." Under Massachusetts law, a contractual provision is considered an unenforceable penalty if "from the nature of the transaction and the attending circumstances[,] it appears that the contract is a cloak to hide a sum of money out of proportion to and differing greatly from the actual damages ordinarily arising from a breach." Perfect Solutions, Inc. v. Jereod, Inc., 974 F. Supp. 77, 82 (D. Mass. 1997) (citing A-Z Servicenter, Inc. v. Segall, 334 Mass. 672, 675 (1956)). In 1998, SBERA set the fee amount at two-years annual assessment because their best judgment was that a one-year assessment would, in most cases, tend to under-compensate the Association for the services provided to former members. A three-year assessment, they further concluded, would be too much. An internal review conducted five years later, in May, 2003, confirmed the accuracy and overall fairness of a two-year assessment, (See Tr. Exhibit 4) (internal review of termination fee presented to SBERA Board of Trustees on May 6, 2003), and it is apparent to the Court, therefore, that SBERA's termination fee is a reasonable approximation of the costs incurred when a bank separates itself from the group.

      To receive what one has bargained for is the very essence and purpose for which one enters into a contract. Defendants have received here what they had bargained for -- a two-year fee assessment upon withdrawal from membership in the Association and the benefit of the payment of such assessment by prior withdrawees, in return for their payment of such fee in the event of their own withdrawal. Defendants have no cause to complain and are hereby ordered to

pay Plaintiff SBERA the termination fees owed, plus interest calculated pursuant to Mass. Gen. Laws. ch. 231, §6C.

    SO ORDERED.

                          /s/ Edward F. Harrington
                          EDWARD F. HARRINGTON
                          United States Senior District Judge